## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| AMY C. BREMKE, | : | Case No. 3:17-CV-00011 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Commissioner of the Social | : | |
| Security Administration, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

### I.     Introduction

Plaintiff Amy C. Bremke brings this case challenging the Social Security Administration's denial of her applications for Disability Insurance Benefits and Supplemental Security Income.  She applied for benefits in July 2013, asserting that beginning on June 5, 2013 she could no longer work due to Pseudotumor cerebri with a surgically implanted shunt, memory loss, and hypertension.

"Pseudotumor cerebri … occurs when the pressure inside your skull (intracranial pressure) increases for no obvious reason.  Symptoms mimic those of a brain tumor, but no tumor is present….."  https://www.mayoclinic.org (search for "Psuedotumor cerebri").  "Psuedotumor cerebri signs and symptoms may include … moderate to severe headaches…, ringing in the ears…, nausea, vomiting or dizziness[,] blurred or dimmed vision…, neck, shoulder or back pain."  *Id*.

According to Administrative Law Judge (ALJ) Elizabeth A. Motta, Plaintiff's Pseudotumor cerebri and her other health problems did not constitute a "disability" as defined in the Social Security Act. This conclusion led ALJ Motta to find Plaintiff ineligible for benefits.

In the present case, Plaintiff disagrees with ALJ Motta's decision and seeks an Order reversing her decision and awarding benefits. The Commissioner seeks an Order affirming ALJ Motta's decision.

## II.  Background

Psuedotumor cerebri is an uncommon condition—the Mayo Clinic website reports that it occurs in 1 to 2 people out of 100,000.  https://www.mayoclinic.org (search for "Psuedotumor cerebri").  Given its rarity, it is worth describing in some detail:

> The fluid that surrounds the spinal cord and brain is called cerebrospinal fluid or CSF. Cerebrospinal fluid supplies the brain and spinal cord with nutrients and removes impurities while protecting and cushioning these delicate structures.
>
> Normally, after circulating, CSF is reabsorbed into the body through blood vessels.  But if too much fluid is produced or not enough is re-absorbed, the CSF can build up and cause pressure within the skull, which is an enclosed space.
>
> This pressure can cause symptoms similar to those of a brain tumor, including worsening headache and vision problems.  Untreated [P]seudotumor cerebri can result in permanent problems such as vision loss.

https://johnhopkinsmedicine.org (search for "Pseudotumor cerebri").

Plaintiff was 39 years old on her alleged disability onset date.  This placed her in

the Social Security Administration's category of a "younger" person. 20 C.F.R. §

404.1563(c).[1]  She has at least a high-school education with an additional certification as

a Licensed Practical Nurse.  Over the years, Plaintiff worked as an Outpatient Admitting

Clerk, a Licensed Practical Nurse, a Medical Assistant, and a Resident Care Aide.

During a hearing held by ALJ Motta, Plaintiff testified that she lives with her

fiancé and her four teenage children.  *Id*. at 62.  She drives almost every day, depending

on where her four children need to be.  *Id*.

Plaintiff explained that she began to have headaches in 2003.  Her physician

discovered swelling in her optic nerve and sent her to the emergency room for a spinal

tap.  Plaintiff also explained, "Normal pressure is up to 18 and mine was 56, so I think I

was in the hospital for nine days at that time, and we tried to manage symptoms with

medication, and when that wasn't working, I had the … shunt in my placed, and that

wasn't keeping up with fluid production, so that's when we went with the VP

[Ventriculoperitoneal] shunt, which is the one in my head."[2]  *Id*. at 65-66.

Plaintiff testified that she is unable to work due to short-term memory loss after

her last brain surgery (a "shunt revision") in June 2013.  *Id*. at 64-65, 72-73.  She copes

with her memory loss by writing everything down.  If she does not, she will forget things.

---

[1] Citations to Disability Insurance Benefits regulations also refer to the Court's consideration of  the
corresponding Supplemental Security Income regulations.

[2] Plaintiff's understanding of normal CSF pressure seems correct.  "The normal range for CSF is reported
differently in various sources, with most reporting a normal range of 7-18 $cmH_2O$ in adults, though some
consider the normal range 5-25 $cmH_2O$…."  https://www.aliem.com (footnotes omitted) (search for "tips
for interpreting CSF opening pressure").

*Id*. at 64.  Plaintiff has undergone 3 brain surgeries.  *Id*. at 65.

Plaintiff's last surgery, in June 2013, did not relieve her daily headaches.  *Id*.  She testified, "My body makes too much spinal fluid, so it builds up and puts the pressure on my brain, which causes headaches.  It's called intracranial hypertension."  *Id*. at 66.  When she feels like the pressure is up, she gets a spinal tap.  Her last one was two months before the ALJ's hearing in June 2015.

Plaintiff testified that she is supposed to return to see her neurosurgeon (James B. Elder, M.D.) at Ohio State University about another shunt-revision surgery.  *Id*. at 67.  She reported that the only time she does not have a headache is when she sleeps because she does not feel anything while sleeping.  *Id*. at 67-68.  She takes medication at bedtime to help her sleep.  Her headache pain is better when she is upright.  *Id*. at 68.  She sleeps "a couple hours" during the day to help manage her pain.  *Id*. at 74.  She describes her pain as constant— "It's always, it's always there."  *Id*. at 78.  Bending over worsens her pain.  *Id*.

Plaintiff takes medication for pain 3 times a day, and she takes medication for hypertension and hypothyroidism.  *Id*. at 69, 74.  She rated her daily headache-pain severity at a level of 2-3 on a 1-10 scale (10 being the worst pain she'd ever felt).  *Id*. at 73.  In the morning when she wakes up her pain level is at 5.  Medication helps reduce her pain to the 2-3 level.  *Id*.

She explained that she's had procedures done including occipital nerve blocks,

epidural steroid injections, and radiofrequency ablation of her optical nerves. *Id* . at 75. She further explained that the ablation procedure helped with the pain that would radiate up the back of her head, but she still had "a lot of pain at the base of [her] skull." *Id*.

Regarding her daily activities, Plaintiff testified that she can perform household chores, when she feels well enough to do them. *Id*. at 70. During a good week, this might occur about 4 days, although it does not usually occur that often. She is generally able to follow a program she watches on television, except she doesn't always remember what she watched. *Id*. at 77. She noted, "sometimes it's just good to have the … mindless entertainment." *Id*. Sometimes she plays a game on her phone, but she does not have any hobbies. *Id*. at 73.

Plaintiff does no yard work. *Id*. at 71. Before her daughter turned age 17, Plaintiff drove her teenagers a block and a half to school, when the weather was bad. Her fiancé drove the flock to school when Plaintiff was not feeling well. At the time of the ALJ's hearing, Plaintiff's 17-year-old daughter generally drove them to school.

Plaintiff is able to go to the store. *Id*. She occasionally visits with relatives or friends. *Id.* She does not regularly go anywhere. She no longer reads books because she cannot remember what she read. She used to read all the time and considered herself to be an avid reader. *Id*. at 72, 76. She uses a weekly pillbox that her teenagers help her with. If she doesn't use the pillbox, she will not remember whether she has taken her afternoon medication. *Id*. at 79-80.

## III.    Medical Evidence

A vocational expert testified during the ALJ's hearing that a hypothetical person with the work limitations identified in the ALJ's assessment of Plaintiff's residual functional capacity, could not perform the work Plaintiff had done in the past, but could perform a significant number of jobs available in the national economy. *Id*. at 82-83.

The vocational expert also testified that if this hypothetical person would be off task more that than 10% of the workday beyond normal breaks, "it would push this to well over an hour of being off task every day. I would be unable to identify competitive employment." *Id*. at 84. She further indicated that there would not be jobs available for this hypothetical person was absent at least two days a month. *Id*.

* * * *

In December 2010, Plaintiff's primary-care physician, Karen Frank, D.O., reported that between January and August 2010, Plaintiff had to use an ambulatory aid due to loss of balance to prevent falls. She was no longer using an ambulatory aid in December 2010. (Doc. #4, *PageID* #s 929-30). Dr. Frank opined that Plaintiff suffered from "extreme" headaches. *Id*. at 931.

In July 2011, was seen in a clinic run by neurosurgeon James B. Elder, M.D., at Ohio State University. Dr. Elder noted that Plaintiff had a "history of Pseudotumor cerebri and Chiari malformation. These have been managed at a different facility up until recently when the patient presented to our emergency room secondary to a 2 month

history of worsening headaches.  Lumbar puncture at that time showed normal pressure per the patient."  *Id*. at 973.  Plaintiff reported that she'd experienced "gradually worsening occipital headaches for the last 2 months.  Her pain is now to the point where she can no longer care for her children."  *Id*.  She described the pain as "emanating from the base of her head radiating upwards.  She has a number of others … including pain in her mid and upper back, unsteady gait, paresthesias in all 4 extremities and difficulties with short-term memory.  This constellation of symptoms as well as other symptoms have all been worsening over the past 2 months…."  *Id*. at 973-74.

In June 2012, Dr. Elder performed surgery on Plaintiff involving placement of right front Ventriculoperitoneal shunt.[3]  *Id*. at 973.   Plaintiff saw Dr. Elder in late June 2012 for her first postoperative visit.  *Id*. at 955.  She reported that she had done very well since her surgery.  Dr. Elder noted, "She would like a letter to be able to return to work."  *Id*.  After Dr. Elder examined Plaintiff, he wrote that she "has done very well since surgery.  She has had no further headaches and is very happy with her outcome.  I discussed activity levels and recommended that she continue to avoid strenuous activity for another 4 weeks.  She is in agreement with this plan."  *Id*.

Plaintiff next saw Dr. Elder in August 2012.  She had begun to experience new headaches 3 weeks before this clinic visit.  *Id*. at 962.  She asked for an outpatient

---

[3] "Ventriculoperitoneal shunting is surgery to treat excess cerebrospinal fluid ... in the brain…." https://medlineplus.gov (search for "Ventriculoperitoneal shunting").

workup "as she does not feel that her symptoms are severe enough to merit admission at this time, and she does not want to miss work." *Id*. Dr. Elder ordered various tests including a shunt series/head CT scan.

Dr. Elder's progress notes in early November 2012 explain that after he placed the Ventriculoperitineal shunt on June 1, 2012, Plaintiff "did well for a few months but then developed recurrence of her headaches. Subsequent lumbar punctures in the emergency room have shown pressures around 18 mm Hg. She feels her headaches could be treated if the pressures could be consistently below 10 mm Hg, because after one of the lumbar punctures when the closing pressure was 7 mm Hg, the patient had no headaches for 6 weeks…." *Id*. at 967. Plaintiff underwent an X-ray shuntogram which showed no evidence of shunt malfunction. *Id*. Dr. Elder discussed surgical options with Plaintiff and reported, "I also discussed with her that with her normal pressures and no evidence of shunt failure, that her headaches may not be due to a shunt problem or spinal fluid problem, which she should discuss with her neurologist…." *Id*.

* * * *

In April 2013, Cindy Parziale, C.N.P., saw Plaintiff for follow-up after a hospital stay. During examination Plaintiff "went into a pseudo seizure where she rocked back and forth…." *Id*. at 1095. She was able to respond to her spouse talking, did not drool, and was able to understand commands. She cried but was alert when the episode ended. When her child wet her pants, Plaintiff was able to get up and clean up the child right

away.  Plaintiff stated that she wanted to get into the neurologist's office sooner than scheduled.  She also asked for a letter to be off work, and Ms. Parziale noted, "I see no reason for note."  *Id*.  Plaintiff also did not feel she could drive, but Ms. Parziale opined, "I think she would be fine to drive because I think she is alert enough and would not do anything to harm herself.…"  *Id*.

In May 2013, Plaintiff presented to the emergency room with headache pain.   The attending physician documented decreased strength in the upper extremity, full strength in the other extremities, and normal coordination.  *Id*. at 943-50.  A CT scan was taken of Plaintiff's head that revealed no significant abnormalities.  *Id*. at 949.  The attending physician called Plaintiff's neurologist, who stated that he "specifically told her not to come to the emergency room for headaches."  *Id*. at 946.

On June 5, 2013—Plaintiff's asserted disability onset date—Dr. Elder performed a "Ventriculoperitoneal shunt revision and replacement of intraventricular catheter and valve."  *Id*. at 990.  He noted, "[I]ncreased complexity due to revision surgery with significant scar tissue increasing the time of dissection by greater than 50%."  *Id*.

Plaintiff saw Dr. Elder in July 2013.  She reported that "her headaches remain improved since surgery.  She denies any new neurologic symptoms.  She continues to have difficulty with short term memory, although during our conversations she again exhibits no difficulty recalling events of the recent and distant past, and plans for the near future.  She denies seizures."  *Id.* at 1005.  After examining Plaintiff, Dr. Elder stated that

she "has done well since surgery. Her headaches are improved…." *Id*.

When seen in the emergency room in August 2013, Plaintiff reported that she had run out Vicodin. *Id*. at 1014-21. X-rays showed intact placement of the shunt. *Id*. at 1008-09, 1012-13. A CT of her head showed a "Shunt catheter entering from the right frontal bone is in stable position. There is no mass effect, midline shift or acute hemorrhage. …" *Id*. at 1022. The CT also revealed no enlargement of her ventricles (ventriculomegaly). *Id*.

In September 2013, Plaintiff saw Dr. Nanda because she had been feeling tired all the time. *Id*. at 1495. Dr. Nanda diagnosed Plaintiff with hypothyroidism. Dr. Nanda also noted that Plaintiff was not having a headache. *Id*. at 1496. Plaintiff went to the emergency room again in November and December 2014 due to constant headache. *Id*. at 1522-26, 1537-38.

* * * *

Plaintiff saw neurologist, Timothy Schoonover, D.O., beginning in March 2014. *Id*. at 1500. Her treatment with Dr. Schoonover included Botox injections and lumbar punctures to test cranial pressure. *Id*. at 1500-17, 1726-43. Dr. Schoonover's examination findings generally showed a mildly abnormal Romberg's test but otherwise normal neurological findings. *Id*. at 1506, 1508, 1516, 1740-43. Plaintiff did report to Dr. Schoonover of significant improvement in headaches with Botox injections. *Id*.

Plaintiff reported to Dr. Nanda in June 2014 that her headache had been acute and

occurring in a persistent pattern.  Plaintiff described it as a "moderate, pounding and a pressure sensation."  *Id*. at 1478.

In September 2014, Plaintiff saw Dr. Nanda due "for headache."  *Id*. at 1464.  Her symptoms included numbness in both arms and pain radiating to both the left and right neck.  Plaintiff described the pain "as aching (pressure)."  *Id*.  She told Dr. Nanda that she was seeing a pain-management physician "that does procedures, but doesn't prescribe narcotics.  He [the pain-management physician] put her back on Neurontin…."  *Id*.  She told Dr. Nanda that Neurontin doesn't work.  She requested a prescription for pain medication.  Dr. Randa gave Plaintiff a Toradol/Phenergan injection.  *Id*.

Plaintiff saw Dr. Nanda in January 2015 for "migraine headache."  *Id*. at 1709.  Symptoms included headache and nausea.  The pain did not radiate.  She described the pain as throbbing and sharp.  Its onset was sudden.  Plaintiff reported that the local emergency room "is telling her that they won't help her anymore because she is treating the ER like a Pain clinic.  The [Plaintiff] is in tears and states she sleeps all the time due to her headaches.  [Plaintiff] would like to have help with her issues."  *Id*.  Dr. Nanda prescribed Toradol and Phenergan and referred Plaintiff to a neurologist.  *Id*. at 1711.

Dr. Nanda's treatment notes in June 2015 reveal that Plaintiff complained of experiencing daily headaches for the previous eight weeks.  *Id*. at 1706.  She would like to have pain medication instead of a spinal tap.  She told Dr. Nanda that she was no longer able to go to the emergency room because she was labeled a drug seeker.  Dr.

Nanda did not administer any injections noting, "I believe the headaches may be due to the blood pressure elevation." *Id*. at 1708.

****

Plaintiff received pain management treatment through Ohio Pain Solutions/Dayton Pain Management from August 2012 through February 2014. *Id*. at 1218-93, 1356-98. Plaintiff was treated with pain medication and an exercise program.

On September 17, 2013, Plaintiff reported that her headache pain "is a 10/10 in severity and 8/10 in severity with medications and has an aching and throbbing quality and does not radiate." *Id*. at 1255. Her pain was aggravated with activities of daily living. *Id*.

On September 30, 2013, Plaintiff again stated that her pain "is a 10/10 in severity and 8/10 in severity with medications and has an aching and constant quality and does not radiate." *Id*. at 1260. She also told a physician that her previous medications were ineffective, but the physician noted that she had just started taking them correctly. *Id*.

Plaintiff underwent a CT scan in October 2013 that revealed a "[s]uggestion of mild diffuse annular bulge at C6-7" but was an otherwise normal CT of her cervical spine. *Id*. at 1265.

On October 17, 2103, Plaintiff returned to Dayton Pain Management. She described her pain as "10\10 in severity without medications and 6/10 in severity with medications." *Id*. at 1270. She informed the physician that she had been correctly taking

her medications for over a month but they "are not effective—not strong enough."  *Id*.

On November 11, 2013, Plaintiff reported gradual onset of daily headaches that were getting worse, lasting all day, and waking her up during the night.  She had been able to sleep only 3 hours in a row due to pain.  "The headache is characterized as moderate, pounding and a pressure sensation."  *Id*. at 1233.  Plaintiff described her headaches "as … located in the back of [her] head in the middle and base of [her] skull where fluid exchange would be.  Feels like it is going to explode when she [is] sneezing or coughing."  *Id*.

In late January 2014, Plaintiff described her head pain at a 9/10 in severity and 6/10 in severity with medications and with an aching and a throbbing quality and the pain was not radiating.  Her pain was aggravated by activities of daily living and noise, and was  alleviated by heat and medications.  *Id*. at 1375.

On February 18, 2014, Plaintiff complained of headaches similar to past episodes due to intracranial hypertension.  *Id*. at 1595.   She was found to have a normal neurological exam including cranial nerves, orientation, mentation, motor and sensory exam, cerebellar testing, and normal gait.  *Id*. at 1593.  A CT scan of Plaintiff's head on February 18, 2014 resulted in 2 impressions: "1. Possibly there is some overshunting.  (2) No acute intracranial findings."  *Id*. at 1586.  "Overshunting" or "overdrainage occurs when the shunt allows CSF [cerebral spinal fluid] to drain from the ventricles more quickly than it is produced.  Overdraining can cause the ventricles to collapse, tearing

blood vessels and causing headaches….”  https://fda.gov/MedicalDevices (search for

“risks of CSF shunts”).

On February 21, 2014, Plaintiff underwent a lumbar puncture that showed her

“pressure was borderline elevated at 18 mm of water…” (Doc. #4, *PageID* #1500).  A

physician removed a total of 19.5 cc of cerebral spinal fluid.  There was a closing

pressure of 12 mm of water.  *Id*.

Plaintiff went to the emergency room in April 2014 due to a worsening headache.

A CT scan was performed and compared to her February 2014 CT.  The resulting report

states, in part, “No definite acute intracranial abnormality is identified.  Right frontal

shunt catheter is in similar position.  Ventricular system appears grossly stable.  It is

somewhat diminutive in the lateral and 3rd locations, possibility of over shunting cannot

be excluded but again is stable.  Cannot exclude Chiari I malformation.”  *Id*. at 1568.

“Chiari malformation … is a condition in which brain tissue extends into your spinal

canal…. Chiari malformation type I develops as the skull and brain are growing. As a

result, signs and symptoms may not occur until late childhood or adulthood.”

http://mayoclinic.org (search for “Chiari malformation”).  Plaintiff was treated with

medications (Dilaudid Zofran and Valium) and her symptoms markedly improved.  (Doc.

#4, *PageID* #1574).

In October 2014, Plaintiff went to the emergency room after hitting her head on a

slanted ceiling two to three days before.  Her headache was continuing to get worse and

she felt dizzy.  *Id*. at 1550.  A CT scan of Plaintiff's head showed no significant

abnormalities.  *Id*. at 1549.  She obtained marked relief of her symptoms when treated

with medication (Dilaudid, Antivert).  *Id*. at 1555.  She again visited the emergency room

with headaches and was treated with medications in early and late November 2014, and

early and mid-December 2014.  *Id*. at 1522-46.

In September 2014, Plaintiff received a Botox injection from Dr. Schoonover.  He

wrote that Plaintiff "has a complicated headache problem with her Benign Intracranial

Hypertension, Cervical-Occipital Neuralgia and migraines."  *Id*. at 1509.  Botox therapy

had reduced the frequency of her migraines.  *Id*.

In October 2014, Dr. Schoonover reported that Plaintiff tolerated her Botox

injections well.  He increased her dose to 230 units as she was still requiring Toradol and

Phenergan Injections from her primary care physician between the Botox injections.  She

has had fairly significant improvement in the severity of her headaches.  Plaintiff also

reported that she has less severe daily headaches, and only 2-3 severe migraines per

month.  Her baseline was 30 migraines per month.  *Id*. at 1506-07.

## IV.  Standard of Review

The Social Security Administration provides Disability Insurance Benefits and

Supplemental Security Income to individuals who are under a "disability," among other

eligibility requirements.  *Bowen v. City of New York,* 476 U. S.  467, 470 (1986); *see* 42

U. S. C.  §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security

Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U. S. C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U. S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.,* 581 F. 3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.,* 478 F. 3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.,* 741 F. 3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.,* 486 F. 3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met: "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley,* 581 F. 3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.,* 375 F. 3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . " *Rogers,* 486 F. 3d at 241 (citations and internal quotation marks omitted); *see Gentry,* 741 F. 3d at 722.

The other line of judicial inquiry—determining whether the ALJ applied the correct legal criteria—may result in reversal even when substantial evidence supports the

ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F. 3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F. 3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F. 3d at 651 (quoting in part *Bowen*, 478 F. 3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F. 3d 541, 546-47 (6th Cir. 2004)).

## V. The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's applications for benefits. She did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. Moving through step 1, he found at steps 2 and 3 that Plaintiff's impairments—including her severe impairments of Pseudotumor cerebri with history of brain surgeries (shunt placements) and benign intracranial hypertension; headaches with possible chronic pain disorder; and depressive disorder—did not automatically entitle her to benefits. (Doc. #4, *PageID* #s 39-42).

> At step 4, the ALJ found that the most Plaintiff could do despite her impairments—her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was "less than the full range of light work: lift and/or carry up to 20 pounds occasionally or 10 pounds frequently; occasional postural activity (climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling); no climbing ladders, ropes, or scaffolds; no exposure to hazards, such as dangerous machinery or working at unprotected heights; no exposure to vibration; moderate noise,

defined as no more than level 3 per the Dictionary of Occupational Titles (DOT) (similar to an office environment); an indoor, temperature-controlled environment; simple, repetitive tasks; low stress work with no strict production quotas or fast past and only routine work with few changes in the work setting; no contact with the public as part of job duties; and no teamwork.

*Id*. at 42. The ALJ also found at step 4 that Plaintiff could not perform any of her past relevant work.

At step 5, the ALJ concluded that Plaintiff could perform a significant number of available jobs. *Id*. at 48-51. This led ALJ Motta to conclude, in the end, that Plaintiff could perform a significant number of jobs that exist in the national economy. This, in turn, meant that Plaintiff was not under a benefits-qualifying disability. *Id*. at 51-52.

## VI.    Discussion

Plaintiff contends that ALJ Motta erred in not finding Plaintiff limited to work allowing her to be off task 10% or more of the work day or absent 2 or more days per month. The ALJ further erred, according to Plaintiff, by not fully considering the vocational expert's testimony that no jobs would be available to a hypothetical person who would be either off task for 10% or more of the workday or absent from work 2 or more days per month.

The Commissioner contends that the ALJ did not err and that substantial evidence supports her decision, including her assessment of Plaintiff's headaches and residual functional capacity.

"In many disability cases, the cause of the disability is not necessarily the

underlying condition itself, but rather the symptoms associated with the condition."

*Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247 (6th Cir. 2007). "There

is no question that subjective complaints of a claimant can support a claim for disability,

if there is also objective medical evidence of an underlying medical condition in the

record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). ALJs,

however, are not required to accept as credible a claimant's subjective reports of pain and

other symptoms and "may properly consider the credibility of the claimant." *Walters v.

Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citation omitted); *see Jones*, 336

F.3d at 476. An ALJ's credibility findings "are to be accorded great weight and

deference, particularly since an ALJ is charged with the duty of observing a witness's

demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility

must be supported by substantial evidence." *Walters*, 127 F.3d at 531 (citations omitted).

ALJ Motta determined that Plaintiff's assertion that she had not been able to work

since her disability onset date "is not supported by objective medical evidence." *Id*. at

43. To the extent the ALJ required objective medical evidence to support Plaintiff's

testimony about the severity and frequency of her headache pain, this was error. Social

Security Regulations promise, "we will not reject your statements about the intensity or

persistence of your pain or other symptoms or about the effect your symptoms have on

your ability to work solely because the available objective medical evidence does not

substantiate your statements." 20 C.F.R. § 404.1529(c)(2). The question, instead, is

whether there is objective evidence of an underlying medical condition. *See Jones*, 336 F.3d at 475. In the present case, the record conclusively establishes that Plaintiff has suffered for many years with debilitating headaches due to increased cerebral spinal fluid pressure in her head. The record also conclusively establishes that Plaintiff has a surgically implanted shunt in her head since the time of her disability onset date due to the increased pressure of her Psuedotumor cerebri, the existence of which is established and relieved, at times, by spinal taps. Physicians, moreover, have for many years sought to relieve the headache pain not only with surgical shunts and shunt revisions but also with various types of strong pain medications and Botox treatments. Although Plaintiff has at times received some pain relief, the records over time show that any pain relief she has obtained from treatment has been temporary and intermittent, if not fleeting.

The ALJ also discussed the results of Plaintiff's CT scans and the absence of neurological findings on examination without recognizing the insignificance of such evidence in the presence of Pseudotumor cerebri. One well-respected medical treatise reports that symptoms and signs of Pseudotumor cerebri "include headache of varying severity (often mild) and papilledema in a patient who otherwise appears healthy…. CT and MRI scans generally are normal or show a somewhat small ventricular system. EEG is normal. CSF pressure is increased …." The Merck Manual of Diagnosis and Therapy, 1448-49 (17th Ed. 1999).

The ALJ recognized that Plaintiff could no longer go to a local hospital emergency

room because she had apparently been labeled a "drug seeker," and Dr. Nanda indicated she would no longer treat Plaintiff with Toradol injections. To the ALJ, this and other references to miniscule items of evidence presented the question of whether Plaintiff's "complaints of pain were for the purpose of treating pain or were more for the purpose of obtaining potent drugs." *Id.* at 45. In posing this question, however, the ALJ unreasonably magnified isolated comments in the record without considering together with Plaintiff's well-documented pain-producing condition. The ALJ simply overlooked or ignored at this point in her decision that Plaintiff had an objectively verified medical condition that often caused her serious headache pain. *See* Doc. #4, *PageID* #43-45. Furthermore, Plaintiff herself provided a logical basis for explaining frequent hospital visits by testifying that she sought care at the emergency room during times of increased and ongoing headache pain. There is, moreover, scant—if any—evidence in the record showing that any physician doubted she suffered from Pseudotumor cerebri accompanied by frequent headaches. This is a strong indication that Plaintiff provided credible testimony. *Cf. Felisky v. Bowen*, 35 F.3d 1027, 140 (6th Cir. 1994) ("In ruling out the possibilities, the examining physicians must have ruled out the possibility that Felisky is a hypochondriac or that she is exaggerating her symptoms."). And, at least one record-reviewing physician found Plaintiff's statements about her symptoms and limitations to be mostly credible. (Doc. #4, *PageID*# 904).

 As noted above, Dr. Frank has been Plaintiff's long term treating physician.

Indeed, the record shows that Dr. Frank or another primary care physician from Wilson Family Care have been treating Plaintiff since 2008 and continued to treat Plaintiff through at least the time of the administrative hearing.   (Doc. #4, *PageID* #467).  Dr. Frank and other physicians at Wilson Family Care consistently document in treatment notes—both before and after Plaintiff's asserted disability onset date—that she frequently suffered moderated to severe, and intractable, headaches. *See, e. g.* Doc. #4, *PageID* #s 380-470, 929-33, 1075-1214, 1456-98, 1703-22.

Dr. Frank opined in December 2010 that Plaintiff had "extreme headaches" together with memory loss. *Id*. at 930-31.  Dr. Frank's treatment records are consistent with other physician-provided evidence.   For example, Dr. Nanda treated Plaintiff from in 2013-15 where he prescribed Toradol and Phenergan and referred her to a neurologist. *Id*. at 1711.   Dr. Elder, her surgeon, performed two surgeries first implanting then replacing her shunt. *Id*. at 955, 990.  Plaintiff testified at the hearing that she was returning to Dr. Elder for another shunt replacement. *Id*. at 67.   Treatment records from the Ohio Pain Clinic document that Plaintiff was treated with injections and medications from August 2012 through February 2014.   *Id*. at 1218-1293, 1356-98.  Another neurologist, Dr. Schoonover, treated Plaintiff with Botox injections and lumbar punctures. *Id*. at 1500-17, 1726-43.  In addition, the record contains numerous visits to the emergency room with complaints of headache.  Plaintiff testified that she was going to the emergency room in addition to her prescribed medication, "[w]hen the medication

22

itself wasn't enough to keep the pain at an acceptable level." *Id*. at 80. Hospital and physician records confirm her testimony. *E.g.*, Doc. #4, *PageID* #s 908-17, 937-50, 1008-1214, 1237-1308, 1356-93, 1456-98, 1660-1724. Additionally, Plaintiff's reports of disabling headache pain have been consistent over time, and she requires strong prescription medication to obtain relief from her headache pain. *E.g.*, Doc. #4, *PageID* #s 908-17, 937-50, 1218-41,1237-1308, 1356-93, 1456-98, 1660-1724.

Lastly, Plaintiff's contentions are well taken in that the ALJ ignored or overlooked evidence showing that her headaches occurred intermittently. Regardless of whether or not the ALJ should have found Plaintiff unable to work 10% of the time or more, the ALJ erred by ignoring the impact Plaintiff's intermittent headaches had on her residual functional capacity. It was likewise error for the ALJ to consider Plaintiff's ability to engage in some daily activities without considering her inability to perform such activities when suffering from serious headaches due to Pseudotumor cerebri. "[A] substantiality of evidence evaluation does not permit a selective reading of the record.... Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted)).

## VII. Remand For Benefits

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E. g.*, *Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence

of disability is overwhelming or strong while contrary evidence is lacking. The evidence conclusively establishes that Plaintiff has a long-standing Pseudotumor cerebri accompanied by headaches and memory loss. This condition has required surgical implantation of shunts, most recently a Ventriculoperitoneal shunt placed in her skull followed by surgical revision as well as other non-surgical treatments. In addition, her reports of headaches and pain have been continuous and consistent over time, her treating physicians have documented the many and frequent occurrences of her serious headaches, and spinal taps have confirmed the presence of Pseudotumor cerebri. In addition, given the evidence in the present record, a remand would serve no purpose other than delay.

Accordingly, reversal of the ALJ's decision and remand for an award of benefits are warranted.

## IT IS THEREFORE ORDERED THAT:

1.  The Commissioner's non-disability finding is reversed;

2.  The case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits based on Plaintiff's application for Disability Insurance Benefits filed on July 22, 2013 and her application for Supplemental Security Income protectively filed on July 22, 2013; and

3.  The case is terminated on the docket of this Court.

March 28, 2018                                          *s/Sharon L.  Ovington*
                                                        Sharon L.  Ovington
                                                        United States Magistrate Judge